**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

NEIGHBORHOOD ASSISTANCE
CORPORATION OF AMERICA,

          Plaintiff,

          v.

UNITED STATES DEPARTMENT
OF HOUSING AND URBAN
DEVELOPMENT,

          Defendant.

Civil Action No. 11-cv-1175 (RLW)

<u>**MEMORANDUM OPINION**</u>

     Plaintiff Neighborhood Assistance Corporation of America ("NACA") brings this lawsuit against the United States Department of Housing and Urban Development ("HUD" or the "Department"), challenging the Department's responses to several requests issued by NACA under the Freedom of Information Act ("FOIA"), 5 U.S.C. §§ 552, *et seq.* Through this action, NACA contests the adequacy of the Department's search for responsive records, and asserts that HUD improperly invokes FOIA's statutory exemptions—in particular, the deliberative process privilege under Exemption 5—to withhold and redact otherwise responsive materials. The case is presently before the Court on the parties' cross-motions for summary judgment. Having carefully considered the parties' briefing, the entire record in this matter, and the arguments of counsel during the hearing on July 29, 2013, and having reviewed *in camera* many of the documents withheld and redacted by HUD under FOIA Exemption 5, the Court concludes, for the reasons that follow, that both NACA's Amended Motion for Summary Judgment (Dkt. No. 30) and HUD's Cross-Motion for Summary Judgment (Dkt. No. 32) will be **GRANTED IN PART** and **DENIED IN PART**.

## BACKGROUND

### A. Factual Background

NACA is a not-for-profit corporation and advocacy organization that provides mortgage-related assistance to primarily low- and moderate-income families and communities. NACA operates from offices in 25 different states and the District of Columbia.

On March 1, 2011, NACA sent three separate FOIA requests to HUD. Through these requests, NACA generally sought three categories of documents: (1) records related to HUD's "performance review" of NACA; (2) documents related to HUD's investigation of NACA under the Real Estate Settlement Procedures Act ("RESPA"), and (3) records related to HUD's Office of Inspector General ("OIG") audit of NACA. (*See generally* Pl.'s Ex. 1). On March 4, 2011, NACA reissued the third of these requests—the OIG audit request—directly to HUD-OIG for processing. (Pl.'s Ex. 2). In late March, HUD originally acknowledged its receipt of NACA's requests, and advised NACA that the Department would need some additional time to prepare its response, as fulfilling the request would require consultation between various HUD components, including the Boston field office responsible for the audit. (*See* Pl.'s Exs. 3-5). On July 13, 2011, HUD communicated a responsive estimate to NACA, calculating that its search efforts would take approximately three to four months to complete, at a cost of more than $120,000 in fees to NACA. (Pl.'s Ex. 6). Shortly thereafter, on July 22, 2011, HUD-OIG directly responded to NACA concerning the OIG audit request, producing 21 pages of responsive records, but otherwise advising that NACA's request for "any other documents" related to the audit was insufficiently specific to enable a response. (Pl.'s Ex. 8).

After conferring with HUD's Chief of the FOIA Branch, Deborah Snowden, NACA then agreed to narrow and reframe its requests. (*See* Pl.'s Ex. 7). On August 2, 2011, NACA provided HUD with the following modified FOIA requests:

I.  *Requests Related to HUD's Performance Review Letter Dated December 21, 2010* [the "Performance Review" request]:

1. Any e-mail, memoranda, notes and/or other documents relating to HUD's performance review of NACA described in HUD's December 21, 2010 letter to NACA, including, without limitation, any earlier drafts of such letter;

2. Calendars and/or appointment schedules of HUD staff and officials identifying meetings and/or conversations related to the aforesaid performance review of NACA. This includes the calendars and/or appointment schedules of Shaun Donovan, David Stevens, Vicki Bott, Ruth Roman and Brian Siebenlist.

II. *Requests Relating to HUD's RESPA Review of NACA initiated by Letter from HUD to NACA Dated February 2, 2011* [the "RESPA" request]:

1. Any e-mails, memoranda, notes and/or other documents relating to HUD's RESPA review of NACA described in HUD's February 2, 2011 letter, including, without limitation, any RESPA related complaints made to HUD by any person or entity;

2. Calendars and/or appointment schedules of HUD staff and officials identifying meetings and/or conversations related to the aforesaid RESPA review of NACA. This includes the calendars and/or appointment schedules of Shaun Donovan, David Stevens, Vicki Bott, Ruth Roman and Brian Siebenlist.

III. *Requests Related to the November 17, 2010 Draft Audit Report and the February 16, 2011 Final Audit Report By the HUD Inspector General Regarding its Audit of NACA* [the "Audit" request]:

1. All e-mails, memoranda, notes and/or other documents written by any HUD official to the HUD Inspector General, or to his employees or agents, regarding the aforesaid audit of NACA

2. All emails, memoranda, notes and/or documents written by the HUD Inspector General, or by his employees or agents, in response to any e-mail, memoranda, notes or other document identified in your search for documents responsive to request number III.1 immediately above

3. The calendars and/or appointment schedules of HUD staff and officials identifying meetings and/or conversations related to the aforesaid audit of NACA. This includes the calendars and/or appointment schedules of Shaun Donovan, David Stevens, Vicki Bott, Ruth Roman and Brian Siebenlist.

(Pl.'s Ex. 9). These modified requests are the FOIA requests at issue in this case.

In responding to the Performance Review request, HUD first referred the matter to the FOIA liaison in HUD's Office of Housing, who identified the Single Family Program Support

Division—the HUD component that had undertaken the review—as the HUD component most likely to possess responsive records. (Dkt. No. 30-12 ("Snowden Decl.") at ¶ 8). According to HUD, three individuals within the Single Family Program Support Division were involved with the NACA performance review—Director Ruth Roman, Deputy Director Brian Siebenlist, and Terri Ames, a technical representative; all three were tasked with searching their electronic and paper files for any responsive records. (*Id.* ¶¶ 8-10). HUD also retrieved electronic records for two former HUD officials, David Stevens and Vicki Bott, both of whom had been kept updated about the status of the Single Family Program Support Division's review of NACA. (*Id.* ¶ 13). HUD retrieved electronic records from the email archives of Ms. Roman and Mr. Siebenlist as well. (*Id.* ¶ 14). Along with the Office of Housing, HUD also referred the request to its Office of Public and Indian Housing, which located no responsive records. (*Id.* ¶¶ 8, 15). Further, HUD referred the Performance Review request to the Office of the Secretary, which conducted a search of the calendar and appointment schedule of HUD Secretary Shaun Donovan for responsive records, but the records that were located were deemed non-responsive to NACA's request. (*Id.* ¶¶ 8, 16).

In response to NACA's Performance Review request, HUD ultimately released over 1,500 pages of records to NACA in seven rolling installments over the course of nine months. (*See* Snowden Decl. at ¶¶ 18-23). As relevant to NACA's claims, HUD also withheld 90 records from disclosure under FOIA Exemption 5 (89 in full and 1 in part). (*Id.* ¶¶ 30-31). According to HUD, "the information withheld pertains to predecisional discussions of the performance review outlined in HUD's December 21, 2010 letter to NACA, and drafts of that letter. This information reflects HUD's predecisional deliberative process and their release would discourage open and candid advice, recommendations, and exchange of views within the agency." (*Id.*).

In response to NACA's RESPA request, HUD contacted the Consumer Financial Protection Bureau ("CFPB"), to which responsibility for the RESPA investigation had been transferred in July 2011, and requested that CFPB refer responsive records to HUD. (*Id.* ¶¶ 25-26). In doing so, CFPB advised that its RESPA investigation remained ongoing, which prompted HUD to withhold these records in their entirety under Exemption 7(A). (*Id.* ¶ 27).[1]

Finally, in responding to NACA's OIG Audit request, HUD referred the request directly to HUD-OIG for processing and response. (*Id.* ¶ 28). In turn, HUD-OIG requested the relevant work papers from its Boston regional office, which conducted the NACA audit. (Dkt. No. 30-13 ("Johnson Decl.") at ¶¶ 8-9). After reviewing several hundred pages of these records, HUD-OIG determined that 21 pages were responsive to NACA's request and produced those documents on or around July 22, 2011. (*Id.*). In addition, the OIG Information Technology Division searched for all emails regarding the NACA audit sent to or from OIG personnel, at any time from January 2010 through March 2011. (*Id.* ¶ 10). Following an internal review of those email records, HUD-OIG produced 207 pages of responsive records in mid-December 2011; of this production, HUD-OIG redacted portions of information from 20 pages pursuant to FOIA Exemption 5. (*Id.*). Around the same time, HUD-OIG made its audit file available to NACA for review in February 2012, and it subsequently released another 627 pages of records to NACA. (*Id.* ¶ 11). This production contained 34 pages with some redactions made under FOIA Exemption 5. (*Id.*). NACA and HUD-OIG subsequently met and conferred regarding the remaining withholdings, and HUD-OIG agreed to release some additional records to NACA. (*Id.*). Ultimately, in connection with NACA's Audit request, HUD-OIG withheld 25 records under FOIA Exemption 5 (21 records in full and 4 in part). (*See* Johnson Decl. ¶¶ 12-20).

---

[1]    HUD's response to NACA's RESPA request is not at issue in this lawsuit.

### B. Procedural History

NACA commenced this lawsuit on June 27, 2011.  (*See* Dkt. No. 1).  NACA originally filed a Motion for Summary Judgment in October 2011, but following HUD's continued production of records over the ensuing months, the parties agreed to an amended briefing schedule, which the Court adopted.  (*See* Dkt. No. 28).  NACA then filed its Amended Motion for Summary Judgment, and HUD filed its Cross-Motion for Summary Judgment shortly thereafter.  (*See* Dkt. Nos. 30, 32).  The parties appeared before the Court for a hearing on the cross-motions on July 29, 2013, at which time the Court took the matter under submission. Following oral argument, the Court ordered HUD to submit many of the documents withheld or redacted pursuant to FOIA Exemption 5 for *in camera* review, and the Court has since reviewed those documents.  The matter is now fully ripe for consideration, and the Court's ruling follows.

### ANALYSIS

Through this case, NACA asserts two principal challenges against HUD under FOIA. First, NACA argues that HUD did not conduct an adequate search for responsive records, faulting the Department for failing to review the email messages of HUD Secretary Shaun Donovan and HUD Chief of Staff, Laurel Blatchford.  Second, NACA complains that HUD improperly withheld records under FOIA Exemption 5, insisting that the so-called governmental misconduct exception bars HUD from relying on the deliberative process privilege in this case. After summarizing the overall legal principles guiding the appropriate analysis, the Court considers NACA's claims in turn.

### A. Applicable Legal Standards

"FOIA was intended to 'pierce the veil of administrative secrecy and to open agency action to the light of public scrutiny.'"  *Am. Civil Liberties Union v. U.S. Dep't of Justice*, 655

F.3d 1, 5 (D.C. Cir. 2011) (quoting *U.S. Dep't of Air Force v. Rose*, 425 U.S. 325, 361 (1976)). In view of this objective, FOIA requires federal agencies to release all records responsive to a proper request, unless the records fall within any of the statute's nine enumerated exemptions. *Loving v. U.S. Dep't of Def.*, 550 F.3d 32, 37 (D.C. Cir. 2008); *see* 5 U.S.C. § 552(b) (listing exemptions). "FOIA cases typically and appropriately are decided on motions for summary judgment." *Hainey v. U.S. Dep't of Interior*, 925 F. Supp. 2d 34, 40 (D.D.C. 2013). As in all cases, "[s]ummary judgment is in order where, viewing the record in the light most favorable to the non-moving party, the court finds that there remains no 'genuine issue as to any material fact.'" *Petroleum Info. Corp. v. U.S. Dep't of Interior*, 976 F.2d 1429, 1433 (D.C. Cir. 1992) (quoting FED. R. CIV. P. 56(c)).

When a requester challenges the adequacy of an agency's search, the agency is entitled to summary judgment on such a claim if it can "demonstrate beyond material doubt that its search was 'reasonably calculated to uncover all relevant documents.'" *Valencia-Lucena v. U.S. Coast Guard*, 180 F.3d 321, 325 (D.C. Cir. 1999) (quoting *Truitt v. U.S. Dep't of State*, 897 F.2d 540, 542 (D.C. Cir. 1990)); *see also Nation Magazine v. U.S. Customs Serv.*, 71 F.3d 885, 890 (D.C. Cir. 1995). In many cases, "[s]ummary judgment may be based on affidavit, if the declaration sets forth sufficiently detailed information for a court to determine if the search was adequate." *Students Against Genocide v. U.S. Dep't of State*, 257 F.3d 828, 838 (D.C. Cir. 2001) (internal citation and quotation marks omitted). "If, however, the record leaves substantial doubt as to the sufficiency of the search, summary judgment for the agency is not proper." *Truitt v. U.S. Dep't of State*, 897 F.2d 540, 542 (D.C. Cir. 1990). The governing standard "is not whether there might exist any other documents possibly responsive to the request, but rather whether the *search* for those documents was *adequate*," *Weisberg v. U.S. Dep't of Justice*, 745 F.2d 1476,

1485 (D.C. Cir. 1984) (emphasis in original), and "adequacy is measured by the reasonableness of the effort in light of the specific request," *Larson v. U.S. Dep't of State*, 565 F.3d 857, 869 (D.C. Cir. 2009) (citation omitted). Put another way, to secure summary judgment, "the agency must show that it made a good faith effort to conduct a search for the requested records, using methods which can be reasonably expected to produce the information requested." *Oglesby v. U.S. Dep't of Army*, 920 F.2d 57, 68 (D.C. Cir. 1990).

When an agency withholds records in response to a FOIA request, the agency "bears the burden of proving the applicability of claimed exemptions." *Am. Civil Liberties Union v. U.S. Dep't of Def.*, 628 F.3d 612, 619 (D.C. Cir. 2011); *Public Citizen, Inc. v. Office of Mgmt. & Budget*, 598 F.3d 865, 869 (D.C. Cir. 2009). Inasmuch as "FOIA mandates a strong presumption in favor of disclosure . . . the statutory exemptions, which are exclusive, are to be narrowly construed." *Nat'l Ass'n of Home Builders v. Norton*, 309 F.3d 26, 32 (D.C. Cir. 2002) (internal citations and quotation marks omitted). Summary judgment is proper for the agency when its "affidavits describe the justifications for nondisclosure with reasonably specific detail, demonstrate that the information withheld logically falls within the claimed exemption, and are not controverted by either contrary evidence in the record nor by evidence of agency bad faith." *Larson*, 565 F.3d at 862 (quoting *Miller v. Casey*, 730 F.2d 773, 776 (D.C. Cir. 1984)). "Ultimately, an agency's justification for invoking a FOIA exemption is sufficient if it appears 'logical' or 'plausible.'" *Id.* (quoting *Wolf v. CIA*, 473 F.3d 370, 374 (D.C. Cir. 2007)). As a result, "[t]o successfully challenge an agency's showing that it complied with the FOIA, the plaintiff must come forward with 'specific facts' demonstrating that there is a genuine issue with respect to whether the agency has improperly withheld extant agency records." *Span v. U.S.*

*Dep't of Justice*, 696 F. Supp. 2d 113, 119 (D.D.C. 2010) (quoting *U.S. Dep't of Justice v. Tax Analysts*, 492 U.S. 136, 142 (1989)).

### B. The Adequacy of HUD's Search

In contesting the adequacy of the Department's search, NACA takes issue with only one aspect of HUD's approach: the Department's failure to review the email accounts of HUD Secretary Shaun Donovan and HUD Chief of Staff, Laurel Blatchford, for potentially responsive records. According to NACA, both Secretary Donovan and Ms. Blatchford "were intimately involved in the subject matters of NACA's FOIA requests." (Dkt. No. 30 ("Pl.'s Mem.") at 31). As a result, NACA argues, the Department's exclusion of their email records from its search renders the Department's efforts "inadequate as a matter of law." (*Id.* at 33). NACA additionally claims that HUD ignored "positive indications of overlooked materials," insofar as records already turned over to NACA in response to its FOIA requests reveal that the Secretary and Ms. Blatchford are likely to possess responsive documents. (*Id.*). HUD disagrees, maintaining that it conducted an adequate search. The Department rejoins that, based on the scope of NACA's requests as written, HUD was not obligated to search the email records of Secretary Donovan or Ms. Blatchford. (*See* Dkt. No. 32 ("Def.'s Mem.") at 5-8). HUD further contends that none of the documents uncovered during the course of its review warranted an expansion of its search to include these email records. (*Id.*).

In defending the adequacy of its search, HUD rightly focuses, first, on the text of NACA's requests. As relevant to this issue, NACA's Performance Review request sought "[a]ny e-mail, memoranda, notes and/or other documents relating to HUD's performance review of NACA described in HUD's December 21, 2010 letter to NACA." (Pl.'s Ex. 9). NACA also requested "[c]alendars and/or appointment schedules of HUD staff and officials identifying

meetings and/or conversations related to the aforesaid performance review of NACA," specifically seeking those of "Shaun Donovan, David Stevens, Vicki Bott, Ruth Roman and Brian Siebenlist." (*Id.*).[2] In HUD's view, it crafted an adequate search for records responsive to these requests by identifying the agency component most likely to possess such records—the Office of Housing's Single Family Program Support Division—and focusing its search efforts on the individuals within that division who were involved with NACA's performance review. (*See* Snowden Decl. at ¶¶ 8-14). The Court does not necessarily disagree that this method may have been reasonable at the outset. *See Citizens for Responsibility & Ethics in Wash. v. U.S. Dep't of Justice*, 822 F. Supp. 2d 12, 19 (D.D.C. 2011) (deeming search adequate where "directed at the people and offices most likely to have responsive information"); *Hornbostel v. U.S. Dep't of Interior*, 305 F. Supp. 2d 21, 27 (D.D.C. 2003), *aff'd*, 2004 WL 1900562 (D.C. Cir. Aug. 25, 2004) (finding search adequate where requests "involve[d] one single project dealt with primarily by one division within the Department of Interior," and agency focused its search accordingly). But even assuming this approach was proper initially, it does not follow that, during the course of its review, HUD could then ignore indications that responsive documents were likely to be located elsewhere. And based on the record before the Court, this is precisely where HUD fell short here.

---

[2]     For purposes of this claim, the Court focuses on NACA's Performance Review request, rather than its Audit request. Through the Audit request, NACA sought, in relevant part, emails "written by any HUD official to the HUD Inspector General, or to his employees or agents, regarding the aforesaid audit of NACA." (Pl.'s Ex. 9). In other words, NACA only requested email messages from HUD officials that were sent to OIG personnel. Insofar as HUD-OIG searched all email messages sent to or from all OIG personnel during the applicable time period, (*see* Johnson Decl. ¶ 10), this search would have located any responsive email messages sent by from Secretary Donovan or Ms. Blatchford. Accordingly, the Court finds that, with respect to NACA's Audit request, HUD's search was not inadequate based on its decision not to separately review the email accounts of Secretary Donovan and Ms. Blatchford.

In crafting the methods used to carry out its search, an agency must "follow through on obvious leads to discover requested documents." *Valencia-Lucena*, 180 F.3d at 326. While an agency need not "examine virtually every document in its files, following an interminable trail of cross-referenced documents like a chain letter winding its way through the mail," *Steinberg v. U.S. Dep't of Justice*, 23 F.3d 548, 552 (D.C. Cir. 2001), the agency nonetheless "must revise its assessment of what is 'reasonable' in a particular case to account for leads that emerge during its inquiry," *Campbell v. U.S. Dep't of Justice*, 164 F.3d 20, 28 (D.C. Cir. 1998). In the face of such leads, "[t]he agency 'cannot limit its search' to only one or more places if there are additional sources 'that are likely to turn up the information requested.'" *Valencia-Lucena*, 180 F.3d at 326 (quoting *Oglesby,* 920 F.2d at 68). In view of this framework, the D.C. Circuit has explained that "the court evaluates the reasonableness of an agency's search based on what the agency knew at its conclusion rather than what the agency speculated at its inception." *Campbell*, 164 F.3d at 28; *see also Negley v. FBI*, 169 F. App'x 591, 594-95 (D.C. Cir. 2006) (unpublished). Applying these principles, the Court agrees with NACA that the Department ignored obvious leads suggesting that both Secretary Donovan and Ms. Blatchford are likely to possess documents responsive to NACA's request.

First, with respect to Secretary Donovan, NACA points to several email messages turned over by HUD that show the Secretary's direct involvement in HUD's decision to withhold NACA's fiscal grant. (*See* Pl.'s Ex. 50) (explaining that the decision was Secretary Donovan's "call"); (Pl.'s Ex. 51) (consisting of email chain between Secretary Donovan and Assistant Secretary of Housing Stevens concerning the suspension of NACA's grant). In response, HUD seeks to portray NACA's performance review as a separate and distinct issue from HUD's withholding of NACA's grant, emphasizing that NACA's requests only sought documents

related to the former subject, but not the latter. (*See* Def.'s Mem. at 7-8). But HUD's effort to compartmentalize these two subjects is not persuasive. Indeed, it is without dispute that HUD's ongoing performance review of NACA served as the very basis for HUD's withholding of NACA's grant funds. (*See* Pl.'s Ex. E) (indicating that NACA's grant was being withheld "pending satisfactory resolution of the outstanding program compliance issues," and extending NACA's deadline for "meeting the program compliance issues"). Given this undeniable link, the documents put forward by NACA at least served as a "lead that emerge[d] during [HUD's] inquiry," *Campbell*, 164 F.3d at 28—if not a "positive indication of overlooked materials," *Valencia-Lucena*, 180 F.3d at 326—and HUD was required under FOIA to adjust its search accordingly. That is, upon learning that Secretary Donovan was personally involved with the decision to withhold NACA's grant based on HUD's ongoing performance review, HUD should have pursued that lead by searching the Secretary's email messages for other responsive records related to HUD's performance review of NACA.

The same is equally true—if not more true—with respect to Ms. Blatchford's records. After NACA responded to HUD's performance review by letter dated March 31, 2011, the Department prepared a further response to NACA in or around July 2011. Significantly, NACA points to several documents establishing that HUD officials secured Ms. Blatchford's "okay" and "go-ahead" before sending out this additional response. (*See* Pl.'s Ex. 58) ("I left a signed letter to NACA on your desk. Kevin was going to check with Laurel [Blatchford] to see if she says if it is okay to send out."); (Pl.'s Ex. 59) ("Got the go-ahead from Laurel [Blatchford] to finalize and send the NACA letter."). Since Ms. Blatchford appears to have directly reviewed and approved the Department's response concerning NACA's performance review, it seems likely that she might possess additional records responsive to NACA's request. Consequently, even if the

Department did not think Ms. Blatchford a probable source of responsive documents at the outset of its search, the exhibits cited by NACA are the sort of leads that obligate HUD to reassess the reasonableness of its search under *Campbell* and *Valencia-Lucera*. It may be that HUD's search of these sources yields no additional records, but until HUD pursues these leads, the Court cannot say that an adequate search has occurred.[3]

In sum, the Court agrees that the Department should have reviewed Secretary Donovan's and Ms. Blatchford's email messages in responding to NACA's Performance Review request.[4]

## C. The Propriety of HUD's Withholdings

NACA additionally challenges HUD's reliance on FOIA's statutory exemptions to withhold documents. Before addressing the merits of NACA's challenges, the Court pauses to delineate those aspects of HUD's withholdings that NACA does not contest. First, with respect to NACA's RESPA request, HUD transferred referred this request to the CFPB, which advised HUD that its investigation remained ongoing. (Snowden Decl. ¶¶ 25-27, 35). As a result, HUD withheld all potentially responsive records under Exemption 7(A), 5 U.S.C. § 552(b)(7)(A), and NACA does not take issue with this this determination. Nor does NACA contest HUD's withholding and/or redaction of documents pursuant to Exemption 6. *See id.* § 552(b)(6).

---

[3] The Court also agrees with NACA that HUD's failure to pursue these leads is particularly unreasonable given that NACA brought the above-described records to HUD's attention during the course of the Department's rolling productions. (*See* Dkt. No. 30-2 ("Weber Decl.") at ¶ 21). While the Department correctly observes that an agency "is not obliged to look beyond the four corners of the request for leads to the location of responsive documents," *Kowalczyk v. U.S. Dep't of Justice*, 73 F.3d 386, 389 (D.C. Cir. 1996), this principle does not grant an agency *carte blanche* to ignore additional leads that unmistakably come to light during its search efforts, *see id.* ("This is not to say that the agency may ignore what it cannot help but know.").

[4] Given the narrow scope of NACA's argument, the Court expresses no opinion as to whether HUD's search was inadequate in any other respects. Nor does the Court express any view on NACA's claim that HUD's decision not to search these files was motivated by bad faith, or some desire to shield Secretary Donovan and Ms. Blatchford from involvement with "a politically motivated program review of NACA," as NACA charges. (*See* Pl.'s Mem. at 33).

Instead, NACA's challenge is confined to HUD's withholdings under Exemption 5, and focuses particularly on HUD's reliance on the deliberative process privilege, though NACA contests the propriety of HUD's withholdings pursuant to the attorney-client privilege as well. The Court tackles these issues below.

### 1. **The Deliberative Process Privilege**

FOIA Exemption 5 permits an agency to withhold from public disclosure "inter-agency or intra-agency memorandums or letters which would not be available by law to a party other than an agency in litigation with the agency." 5 U.S.C. § 552(b)(5). "Courts have construed this exemption to encompass the protections traditionally afforded certain documents pursuant to evidentiary privileges in the civil discovery context, including materials which would be protected under the attorney-client privilege, the attorney work-product privilege, or the executive deliberative process privilege." *Dow Jones & Co. v. U.S. Dep't of Justice*, 917 F.2d 571, 573 (D.C. Cir. 1990) (quoting *Formaldehyde Inst. v. U.S. Dep't of Health & Human Servs.*, 889 F.2d 1118, 1121 (D.C. Cir. 1989)). This case turns principally on the scope of the last of these privileges—the deliberative process privilege.

As the full D.C. Circuit has observed, the deliberative process privilege rests on the principle that "the quality of administrative decision-making would be seriously undermined if agencies were forced to operate in a fishbowl." *Wolfe v. U.S. Dep't of Health & Human Servs.*, 839 F.2d 768, 773 (D.C. Cir. 1988) (en banc); *see also Dow Jones & Co.*, 917 F.2d at 573. Stated differently, the privilege "protects creative debate and candid consideration of alternatives within an agency," along with "the integrity of the decision-making process itself by confirming that individuals should be judged by what they decided, not for matters they considered before making up their minds." *Jordon v. U.S. Dep't of Justice*, 591 F.2d 753, 772-73 (D.C. Cir. 1978)

(en banc), *overruled on other grounds by Crooker v. ATF*, 670 F.2d 1051 (D.C. Cir. 1981) (en banc). Two criteria must be satisfied in order for the privilege to apply. The agency must show that the withheld document is: (1) "predecisional," in the sense that it temporally precedes the decision to which it relates; and (2) "deliberative," such that it reflects "the give and take of the consultative process." *Coastal States Gas Corp. v. U.S. Dep't of Energy*, 617 F.2d 854, 866 (D.C. Cir. 1980). In this way, the privilege protects "recommendations, draft documents, suggestions, and other subjective documents which reflect the personal opinions of the writer rather than the policy of the agency." *Id.* The "key question" in determining whether material qualifies "as deliberative" is "whether disclosure of the information would discourage candid discussion within the agency." *Access Reports v. U.S. Dep't of Justice*, 926 F.2d 1192, 1195 (D.C. Cir. 1991) (internal quotation marks and citations omitted).

Relying on the deliberative process privilege in this case, HUD withheld 90 records from disclosure in response to NACA's Performance Review request, 89 records in full and 1 in part; for its part, HUD-OIG withheld 25 records in response to NACA's Audit request—21 records in full and 4 in part. (*See* HUD *Vaughn* Index at ¶¶ 2a-2e, 3a-3e, 7-10, 13-14, 29, 32, 35-38, 41-42; *see also* Johnson Decl. ¶¶ 14, 16, 17, 17a, 17f, 17g, 18a-18p, 19b-19c, 20). Notably, NACA does not contest that these documents satisfy the core requirements of the deliberative process privilege. That is, NACA does not meaningfully dispute that the withheld materials are intra-agency documents that are both predecisional and deliberative, as the privilege requires. Rather, NACA mounts a global attack on HUD's invocation of the deliberative process privilege, arguing that governmental misconduct on the Department's part precludes its reliance on the privilege in this case.

## 2.  The Governmental Misconduct Exception

As compared with the deliberative process privilege, the so-called governmental misconduct exception is much less clearly defined.  The D.C. Circuit has stated in dicta that "where there is reason to believe the documents sought may shed light on government misconduct, the [deliberative process] privilege is routinely denied, on the grounds that shielding internal government deliberations in this context does not serve the public's interest in honest, effective government."  *In re Sealed Case*, 121 F.3d 729, 738 (D.C. Cir. 1999) (internal quotation marks and citations omitted); *see also id.* at 746 ("[T]he [deliberative process] privilege disappears altogether when there is any reason to believe government misconduct occurred.").  Elsewhere, our Circuit has observed—again in dicta—that the word "misconduct" implies "nefarious motives."  *In re Subpoena Served on the Office of the Comptroller of the Currency*, 145 F.3d 1422, 1425 n.2 (D.C. Cir. 1998); *see also Enviro Tech Int'l, Inc. v. U.S. EPA*, 371 F.3d 370, 377 (7th Cir. 2004) (observing that "internal discussions about a course of agency action that would be nefarious, if not illegal, . . . would not be protected by the deliberative process privilege").  But other than these general observations, our Court of Appeals has never squarely applied the exception, nor has it ever defined the scope of "misconduct" that triggers the exception's application.

Those courts in this District to have directly wrested with the exception's scope, however, have construed it narrowly, limiting its application to cases of "extreme government wrongdoing."  *See Nat'l Whistleblower Ctr. v. U.S. Dep't of Health & Human Servs.*, 903 F. Supp. 2d 59, 68-69 (D.D.C. 2012); *see also ICM Registry, LLC v. U.S. Dep't of Commerce*, 538 F. Supp. 2d 130, 133 (D.D.C. 2008) (same).  Recognizing that "[t]he exception runs counter to the purposes that animate the deliberative process privilege," those courts explained the need to apply the exception narrowly as follows:

If every hint of marginal misconduct sufficed to erase the privilege, the exception would swallow the rule. In the rare cases that have actually applied the exception, the 'policy discussions' sought to be protected with the deliberative process privilege were so out of bounds that merely discussing them was evidence of a serious breach of the responsibilities of representative government. The very discussion, in other words, was an act of government misconduct, and the deliberative process privilege disappeared.

*Id.*; *see also Nat'l Whistleblower Ctr.*, 903 F. Supp. 2d at 68-69 (reiterating the same logic).

Moreover, the other examples of the governmental misconduct exception's application in this District seem to recognize a similarly high benchmark, even though those courts did not explicitly state as much. *See Alexander v. FBI,* 186 F.R.D. 154, 164 (D.D.C. 1999) (finding privilege inapplicable under FOIA Exemption 5 where documents related to misuse of a government personnel file to discredit a witness in an ongoing investigation of the Clinton administration); *Tax Reform Research Gp. v. IRS*, 419 F. Supp. 415, 426 (D.D.C. 1976) (concluding that privilege did not apply under FOIA Exemption 5 where documents concerned recommendation to use the powers of the IRS in a discriminatory fashion against "enemies" of the Nixon administration). *Cf. Chaplaincy of Full Gospel Churches v. Johnson*, 217 F.R.D. 250, 256-58 (D.D.C. 2003) (finding that the exception precluded use of the deliberative process privilege to withhold documents as part of the discovery process in discrimination case, where documents were alleged to show unlawful "discrimination against non-liturgical chaplains"—the core issue of the dispute).

Following the lead of these cases, and for the reasons espoused therein, this Court similarly holds that to preclude application of the deliberative process privilege in the FOIA context, the claimed governmental misconduct must be severe enough to qualify as nefarious or extreme government wrongdoing. *See Nat'l Whistleblower Ctr.*, 903 F. Supp. 2d at 68-69; *ICM Registry, LLC*, 538 F. Supp. 2d at 133; *see also Ctr. for Biological Diversity v. Office of Mgmt. & Budget*, No. 07-4997, 2009 WL 1246690, at *12 (N.D. Cal. May 5, 2009) ("The governmental

misconduct exception is applied only in extreme circumstances."). With this backdrop in mind, the Court turns to the alleged misconduct NACA inveighs against here.

NACA advances two theories of governmental misconduct. First, NACA claims that HUD's motives in commencing the OIG audit and the performance review were improperly political, supposedly designed to retaliate against NACA for its heightened advocacy efforts on Capitol Hill. Second, NACA complains that once underway, the OIG audit was improperly conducted because HUD officials wrongly interfered with the audit, purportedly contravening the independence and objectivity mandated by the Inspector General Act. (*See generally* Pl.'s Mem. at 14-29). Following oral argument in this case, the Court reviewed, *in camera*, many of the records withheld by HUD pursuant to the deliberative process privilege.[5] Having now done so, and also taking into consideration the record in this case more broadly, the Court concludes that the contested materials do not reveal any nefarious government wrongdoing that would preclude HUD's reliance on the deliberative process privilege. The Court explains its reasoning in the sections that follow, discussing each of NACA's theories in turn.

### a. *The Purportedly Improper Political Motives Underlying HUD's OIG Audit and Performance Review of NACA.*

According to NACA, HUD began targeting NACA in response to its advocacy campaign in Congress in the summer of 2010, through which NACA encouraged homeowners to contact their Congressional Representatives directly to demand federal intervention in the mortgage and home foreclosure crisis. Since NACA was a HUD-approved counseling agency, NACA asserts

---

[5]     The Court reviewed *in camera* all of the withheld documents that NACA specifically requested. (*See* Pl.'s Mem. at 36-38). The Court's review encompassed unredacted versions of Plaintiff's Exhibits 14, 22, 23, 24, 25, 26 (including withheld attachments), 27, 28, 30, 31 (including withheld attachments), 44, 68, 77, and 86. In addition, the Court reviewed the following withheld email messages: messages from Melanie Roussell dated June 14 and 15, 2011; from Sarah Gerecke dated January 6, 2012; from Genger Charles dated January 14, 2011; from Adria Crutchfield dated January 18, 2011; and from Lionel Lynch dated June 7, 2011.

that many members of Congress blamed HUD for the "ensuing public relations embarrassment" and "demanded that HUD address NACA's conduct." (*See* Pl.'s Mem. at 6). In response, NACA theorizes, HUD improperly initiated a retaliatory OIG audit and program review of NACA. The Court stresses at the outset that, in arguing that that HUD abused its investigative authority for improper political purposes, NACA faces an uphill challenge. It is well settled that a "presumption of regularity supports the official acts of public officers and, in the absence of clear evidence to the contrary, courts presume that they have properly discharged their official duties." *Latif v. Obama*, 677 F.3d 1175, 1178 (D.C. Cir. 2012) (quoting *Sussman v. U.S. Marshals Serv.*, 494 F.3d 1106, 1117 (D.C. Cir. 2007)); *see also Fed. Trade Comm'n v. Bisaro*, 757 F. Supp. 2d 1, 9-10 (D.D.C. 2010) (affording FTC subpoena a "presumption of regularity" in response to an argument that it was issued "for an improper purpose").

In support of its theory, NACA principally relies on the timing of the OIG audit's commencement. NACA points out that on July 28, 2010, the HUD Assistant Inspector General for the Office of Audit recommended that the NACA audit be reconsidered, which prompted the Regional Inspector General to place the audit "on hold." (*See* Pl.'s Ex. 12). On August 5, 2010, though, HUD-OIG officials received an email message from a Senate Appropriations Committee staffer, Mr. Kamarck, forwarding "inquiries" about NACA that had been raised by constituents, and the same day, the HUD Inspector General directed that the NACA audit go forward. (*See* Pl.'s Ex. 36). According to NACA, "this e-mail chain dramatically depicts the political origins of the NACA audit." (Pl.'s Mem. at 16). But the record belies this contention. Mr. Kamarck's email message makes no reference whatsoever to NACA's advocacy campaign, as NACA seems to suggest. To the contrary, Mr. Kamarck was relaying a constituent's concern about NACA's use of federal funds, and was seeking additional information concerning the extent of

government oversight of NACA's programs. (*See* Pl.'s Ex. 36) ("Our constituent is hoping that someone in our office might be able to advise about the oversight process to ensure that . . . NACA funds are being used appropriately.").[6] To the extent HUD-OIG's audit was prompted or accelerated by these legitimate complaints and inquiries from Congress, this hardly amounts to the sort of improper, politically-motivated action that NACA makes it out to be.[7]

Otherwise, NACA points to a statement purportedly made by HUD Assistant Regional Inspector General Michael Motulski, during a final exit conference with NACA in February 2011. According to NACA, Mr. Motulski commented that the OIG audit had been "an inquisition." (*See* Dkt. No. 30-8 ("Marks Decl.") at ¶ 18; Dkt. No. 30-14 ("Mejia Decl.") at ¶ 21). Notably, Mr. Motulski, in subsequent deposition proceedings, expressly denied making any such remark to NACA representatives. (*See* Dkt. No. 30-15 ("Motulski Dep.") at 56-60). But even taking NACA's allegations at face value, this ambiguous statement on Mr. Motulski's part, without more, does not establish that HUD's OIG audit of NACA was initiated as a means of political retribution, as NACA suggests. In short, NACA simply fails to show that the Department's initiation of the OIG audit was driven by political retaliation.

---

[6] As additional support, NACA relies upon other messages from Congressional staffers to HUD officials, asserting that "NACA's Congressional campaign caused HUD to be 'inundated' with complaints from Congressional offices." (Pl.'s Mem. at 25). But these exhibits are equally unpersuasive. For one, much like Mr. Kamarck's August 2010 message, many of these other messages convey constituent complaints about NACA's consumer practices, rather than frustration with NACA's advocacy efforts. (*See, e.g.*, Pl.'s Ex. 45) (referencing a complaint about NACA's "inappropriate disposal of personally identifiable information" and NACA's failure to contact a participant in its "First Time Homebuyer program"). Moreover, many of these communications were sent after the OIG audit was already underway, and thus cannot have prompted the initiation of the OIG audit in the first place, as NACA suggests. (*See* Pl.'s Exs. 45, 61, 62, 63, 64) (messages dated between August 17 and November 2, 2010).

[7] Indeed, during oral argument, NACA's counsel conceded that there is nothing improper about Congress forwarding constituent complaints to HUD, nor with HUD responding to complaints it received from Congress.

Nor does NACA establish that HUD's performance review of NACA was the product of "HUD's politically motivated reaction to NACA's Congressional campaign." (Dkt. No. 35 ("Pl.'s Reply") at 5). Under applicable HUD regulations, "HUD may conduct periodic . . . performance reviews of all participating agencies [in the Housing Counseling Program]," and that "review will consist of a review of the participating agency's compliance with all program requirements." 24 C.F.R. § 214.307(a), (b). In arguing that HUD's wielded this authority for improper political purposes, NACA points to the supposedly close connection between HUD's review letter and Congressional complaints about NACA forwarded to HUD. In particular, NACA cites to email messages written by HUD officials expressing a desire to issue the NACA letter as soon as possible, to "demonstrate some action" to Congress. (*See* Pl.'s Mem. at 25-27). Whatever support those messages might offer NACA, this theory is squarely undercut by the fact that the program review was already underway when HUD received these Congressional complaints. HUD began its review in August 2010, drafting the initial program review letter as early as August 13, 2010, (*see* Pl.'s Ex. 73), while the messages NACA seizes upon were all written in September 2010 and later, (*see* Pl.'s Ex. 63, 71-72). These documents thus lend no strength to the notion that HUD commenced its program review as a means of politically retaliating against NACA's Congressional advocacy campaign, as NACA suggests.

To the contrary, HUD's program review letter identifies several legitimate compliance concerns with NACA's housing counseling program, many of which plainly predate NACA's heightened advocacy efforts. (*See* Pl.'s Ex. D). HUD sought NACA's responses in connection with several governmental investigations into NACA by the State of South Carolina and the Commonwealth of Virginia during 2008 and 2009, incomplete information in NACA's quarterly activity reports to HUD for fiscal year 2010, and NACA's failure to provide sufficient

information in advance of a performance review of NACA's Los Angeles branch office—which HUD had notified NACA about in July 2010. (*Id.*). HUD also outlined several other concerns that arose out of consumer complaints and the Department's own reviews, including NACA's potential failure to discuss alternatives to NACA loans with consumer clients, NACA's apparent lack of follow up with housing counseling clients, and the propriety of NACA's counseling disclosures. (*Id.*). HUD's focus on these factors—all of which HUD was authorized to review under applicable regulations, *see* 24 C.F.R. § 214.307—belies NACA's argument that the motive behind HUD's review was purely political.

Finally, NACA leans on the substantial overlap between the compliance areas examined in the OIG audit, and those identified in HUD's program review letter. Because HUD formally issued its letter *after* HUD-OIG found no concerns with some of those areas in its draft audit report circulated weeks earlier, NACA argues that there was no legitimate basis for HUD to press forward with the program review. (*See* Pl.'s Reply at 5-7). The Court does not agree. Simply because there may have been some overlap between the issues reviewed by HUD and HUD-OIG does not establish governmental wrongdoing. As the Department rightly points out, the scope of OIG's audit was distinct from the purposes underlying HUD's performance review. The audit's objective was "to determine whether NACA properly administered its HUD grants used for housing counseling activities in accordance with HUD requirements." (*See* Pl.'s Ex. C). HUD's performance review, by contrast, was to evaluate NACA's compliance with HUD regulations more broadly, to determine NACA's continued approval as a participant in HUD's Housing Counseling Program. (*See* Pl.'s Ex. D). The OIG audit expressly did not consider the latter objective. (Pl.'s Ex. C) ("Since HUD has the responsibility to approve and ensure compliance with counseling requirements, *the audit did not evaluate NACA's initial and*

*continued approval as a counseling agency.*") (emphasis added).  There is nothing improper about the existence of some overlap in investigations conducted by an Inspector General and its applicable agency.  *Cf. Adair v. Rose Law Firm*, 867 F. Supp. 1111, 1118 (D.D.C. 1994) (confirming that investigations conducted by the Resolution Trust Corporation and its Inspector General, given their different aims and objectives, "need not be mutually exclusive").  As a result, the Court disagrees that "the true purpose" of HUD's program review letter was political retribution.

Finally, as noted above, the Court has reviewed *in camera* many of the documents that HUD withheld pursuant to FOIA Exemption 5.  None of these materials lend any credence to NACA's argument that the OIG audit or HUD's program review were politically motivated.

In sum, NACA simply fails to establish that HUD's decision to undertake the OIG audit or the performance review approaches the type of extreme governmental wrongdoing that would preclude the application of the deliberative process privilege.

### b.  *HUD's Alleged Interference With The OIG Audit*

NACA's second governmental misconduct theory is that HUD officials improperly influenced and interfered with HUD-OIG's audit.  Stated another way, NACA argues that "OIG's audit of NACA was not conducted in an 'independent' manner as required by law." (Pl.'s Mem. at 2).  This "impropriety," according to NACA, is nothing less than "the hallmark of the audit."  (*See id.* at 22).  Because NACA's argument essentially hinges on its contention that either HUD or HUD-OIG, or both, violated the Inspector General Act of 1978 ("IG Act"), 5 U.S.C. App. §§ 1, *et seq.*, the Court begins there.

Congress passed the IG Act "to create independent and objective units . . . to conduct and supervise audits and investigations relating to the programs and operations" of federal agencies.

5 U.S.C. App. § 2; *see also Truckers United for Safety v. Mead*, 251 F.3d 183, 186 (D.C. Cir. 2001) ("Congress structured the OIG to promote independence and objectivity."). "In short, Congress conferred very broad audit, investigatory, and subpoena powers on each Inspector General, as an independent and objective unit of the department or agency, to help promote efficiency and prevent fraud, waste, abuse, and mismanagement in federal government programs." *Winters Ranch P'ship v. Viadero*, 123 F.3d 327, 330 (5th Cir. 1997). To this end, "Congress intended the IG's investigatory authority to extend to the investigation of recipients of government funding as well as to government agencies themselves." *Adair*, 867 F. Supp. at 1116; *U.S. Dep't of Housing & Urban Dev. v. Sutton*, 68 B.R. 89, 94 (Bankr. E.D. Mo. 1986) ("The [IG Act] conferred upon the OIG the power and the duty to investigate HUD programs for fraud and irregularities and to oversee compliance with HUD regulations by program participants.").

As the Supreme Court has made clear, "OIG's maintain authority to initiate and conduct investigations and audits without interference from the head of the agency." *NASA v. Fed. Labor Relations Auth.*, 527 U.S. 229, 240 (1999) (citing 5 U.S.C. App. § 3(a)); *see also Truckers United for Safety*, 251 F.3d at 186 ("[T]he head of an agency many not interfere with any [Inspector General] investigation."). Indeed, "[o]ne of the most important goals of the [IG] Act was to make Inspectors General independent enough that their investigations and audits would be wholly unbiased." *U.S. Nuclear Regulatory Comm'n v. Fed. Labor Relations Auth.*, 25 F.3d 229, 233 (4th Cir. 1994). Seizing on these principles, NACA argues that the nature of HUD's involvement in the OIG audit at issue in this case amounted to such "interference," purportedly in contravention of the IG Act. The Court disagrees.

Simply put, the IG Act's prescriptions do not operate in such an absolute fashion as NACA urges here. While the Act certainly emphasizes the importance of auditor objectivity and independence, Congress also recognized that there must be some degree of cooperation and interplay between an Inspector General and its designated agency. *NASA*, 527 U.S. at 240 ("In conducting their work, Congress certainly intended that the various OIGs would enjoy a great deal of autonomy. But unlike the jurisdiction of many law enforcement agencies, *an OIG's investigative office, as contemplated by the [IG Act], is performed with regard to, and on behalf of, the particular agency in which it is stationed.*") (emphasis added); *see also* S. REP. NO. 95-1071, at 9-10 (1978), *reprinted in* 1978 U.S.C.C.A.N. 2676 ("[T]he Inspector General must have a close relationship with the Secretary, enjoy his confidence and respect, *and be responsive to his concerns, both as to his specific assignments and as to the Inspector General's overall function in the agency.*") (emphasis added). The IG Act does not impose an absolute bar on agency involvement with an Inspector General audit; the Act only prohibits the agency from *interfering* with such an audit. *See* 5 U.S.C. App. § 3(a) (proscribing an agency head from "prevent[ing] or prohibit[ing] the Inspector General from initiating, carrying out, or completing any audit or investigation"). Involvement and interference are not coterminous.

As HUD points out, the IG Act's provisions expressly contemplate some level of communication and information-sharing between an agency and its Inspector General. In carrying out its audit and investigative functions, the Inspector General is authorized:

> 1) to have access to all records, reports, audits, reviews, documents, papers, *recommendations*, or other material available to the applicable establishment which relate to programs and operations with respect to which that Inspector General has responsibilities under this Act;

*    *    *

3)  to request such *information or assistance* as may be necessary for carrying out the duties and responsibilities provided by this Act from any Federal, State, or local governmental agency or unit thereof;

\*       \*       \*

6)  to have direct and prompt *access* to the head of the establishment involved when necessary for any purpose pertaining to the performance of functions and responsibilities under this Act[.]

5 U.S.C. App. § 6(a)(1), (3), (6) (emphases added).  Relatedly, the IG Act provides that an agency "shall" furnish information or assistance to its Inspector General, "insofar as practicable and not in contravention of any existing statutory restriction or regulation." *Id.* § 3(b)(1).

HUD and HUD-OIG have also developed internal policies concerning the interaction between HUD-OIG and HUD officials.  Generally, HUD Handbook 2000.3 outlines the overall scope of cooperation between OIG and HUD management as follows:

In order for the OIG to most effectively carry out its program integrity activities, HUD management must recognize the need for and take an active role in such activities. *Close coordination between the Inspector General and those responsible for program design and execution is required to maximize the use of resources in achieving the Department's mission efficiently.* To minimize the potential for fraud and program abuse, each group has an important role to play but not to the exclusion of the other.

HUD Handbook 2000.3 Rev-4, Office of Inspector General Activities, at ¶ 6-2 (Feb. 1991) (emphasis added), *available at* http://portal.hud.gov/hudportal/documents/huddoc?id= 20003c6OIGH.pdf.  And as particularly relevant here, in connection with external audits, HUD guidance contemplates input from appropriate HUD officials prior to OIG's issuance of the final audit report: "For OIG-conducted external audits, the report issuer should discuss the audit recommendations with appropriate HUD program officials prior to the exit conference and invite additional input from them before final processing and issuance of the audit report."  HUD Handbook 2000.06 Rev-4, Audit Management Systems (AMS), at ¶ 2-1C (Oct. 2011), *available at* http://portal.hud.gov/hudportal/documents/huddoc?id= 20006CFOH.pdf.  As part of

this process, HUD management officials may: "(1) Concur or non-concur with the audit findings/recommendations; (2) Make known any facts not previously known to the auditor, which may influence the manner in which matters should be reported; (3) Advise on any corrective measures proposed or taken in response to the recommendations; and (4) Propose any alternative action or change to the draft recommendations that would accomplish the same results more economically." *Id.*[8] This framework provides the appropriate scope of HUD involvement during the course of an OIG audit.[9]

According to NACA, the involvement by HUD officials in the OIG audit at issue here exceeded these bounds and interfered with the requisite independence and objectivity mandated by the IG Act. The Court does not agree. Upon review of the record in this case, including an *in camera* review of many of the documents withheld by HUD under Exemption 5, the contested materials do not reveal any improper interference with the OIG audit on HUD's part. Instead, the withheld documents are emblematic of the sort of legitimate, back-and-forth deliberations

---

[8]     HUD submitted excerpts from these handbooks as attachments to the Supplemental Declaration of Richard Johnson. (*See* Dkt. No. 36-1). In response, NACA moved to strike this declaration, taking issue with Mr. Johnson's authentication and submission of these documents for the first time on reply. (*See* Dkt. No. 37). For its part, HUD maintains that Mr. Johnson's supplemental declaration should not be stricken, particularly since the materials attached thereto were expressly relied upon in its original briefing and were amply described in Mr. Johnson's prior declaration. (*See* Dkt. No. 38). Ultimately, the Court need not resolve this dispute because the Court takes judicial notice of the applicable HUD Handbook excerpts summarized above. FED. R. EVID. 201(b); *see Ikon Global Markets, Inc. v. CFTC*, 859 F. Supp. 2d 162, 165 n.1 (D.D.C. 2012) (taking judicial notice of a National Futures Association manual); *Hamilton v. Paulson*, 542 F. Supp. 2d 37, 52 n.15 (D.D.C. 2008) (taking judicial notice of an OPM manual). Since the Court, in turn, does not rely upon the Supplemental Johnson Declaration in rendering its decision, NACA's Motion to Strike will be **DENIED** as moot.

[9]     Insofar as all Inspector General audits are subject to the standards established by the Comptroller General of the United States, the Court also independently reviewed the Government Auditing Standards issued by the U.S. Government Accountability Office, to determine whether these standards set forth any additional guidance on the scope of permissible interaction between an Inspector General and its agency during an audit. However, the Court did not uncover any information on point.

between HUD and HUD-OIG that the IG Act contemplates, and that the deliberative process privilege is designed to protect.

NACA's arguments to the contrary are unavailing. First, NACA seizes on a reference in an OIG "Audit Workpaper," which stated that "the approach taken by [HUD's] Office of General Counsel was to badger the OIG auditors." (*See* Pl.'s Mem. at 18-19). NACA insists that this statement undermines any sense of OIG independence. Having reviewed the redacted portions of this particular "Audit Workpaper" *in camera*, the Court finds that while the "badger[ing]" reference is indicative of a disagreement between officials from HUD's Office of General Counsel and the OIG auditors, it hardly suffices as extreme governmental wrongdoing. *See Hinckley v. United States*, 140 F.3d 277, 285 (D.C. Cir. 1998) ("The deliberative process privilege would soon be meaningless, if all someone seeking information otherwise protected under the privilege had to establish is that there was disagreement within the governmental entity at some point in the decisionmaking process.").[10] In any event, the same document confirms that any potential disagreement was resolved without interference on HUD's part; indeed, in the very next sentence, the OIG auditors explain that HUD officials "realized that, based on OIG audit's responses to Office of General Counsel's line of questioning, their (Office of General Counsel) knowledge of the subject matter was limited at best and that the OIG auditors were much more knowledgeable." (Pl.'s Ex. 23); (*see also id.*) ("[HUD officials] recognized that OIG was at a

---

[10]     By way of background, HUD-OIG had provided HUD officials with a version of its draft audit report and invited feedback in late November 2010, just a couple of weeks before this meeting. (*See* Pl.'s Ex. 13). During HUD's review of the draft report, it appears that HUD officials raised additional concerns they believed might warrant further review by HUD-OIG, and it seems the OIG audit team was unhappy that these issues were first being raised so late in the process. (*See* Pl.'s Ex. 22) ("For all this to come to light now . . . that was not communicated or shared with us during the audit, is disheartening and disingenuous on HUD's part."). During this December 2010 meeting, then, when representatives from HUD's Office of General Counsel questioned the OIG auditors about these newly-surfaced issues, this questioning was understandably met with some frustration on HUD-OIG's part.

disadvantage and could not perform a proper review without having access to all complaints and the performance reviews HUD conducted at NACA.").  Thus, NACA's focus on this isolated "badger[ing]" reference is unpersuasive.

Otherwise, NACA makes much of the fact that the content of the final audit report differs substantially from the content of the original draft report.  It is true, as NACA stresses, that the final draft of the audit report contained changes, including additional, substantive sections discussing conflict of interest issues and the propriety of NACA's disclosure statements that the original draft report did not address.  (*See* Pl.'s Ex. H).  But the disconnect in NACA's argument is that there is no evidence showing that these changes were the result of anything other than permissible cooperation between HUD and HUD-OIG in finalizing the audit report.  That is, while HUD officials may have brought new information and concerns to the attention of HUD-OIG following their review of the draft audit report, so long as the OIG auditors then reviewed those issues independently and made their own determinations and findings, no misconduct can have occurred.[11]  NACA also complains, in particular, that HUD pressured the auditors to

---

[11]    The Court stresses that HUD's involvement in HUD-OIG's *external* audit of NACA raises substantially less concerns *vis-à-vis* the IG Act than it might in the internal audit context. When an Inspector General is conducting an audit of its own agency, the need for independence from agency officials in carrying out the audit is paramount.  Indeed, this was one of the core animating principles underlying the passage of the IG Act:

> There is a natural tendency for an agency administrator to be protective of the programs that he administers. In some cases, frank recognition of waste, mismanagement or wrongdoing reflects on him personally. Even if he is not personally implicated, revelations of wrongdoing or waste may reflect adversely on his programs and undercut public and congressional support for them. Under these circumstances, it is a fact that agency managers and supervisors in the executive branch do not always identify or come forward with evidence of failings in the programs they administer. For that reason, the audit and investigative functions should be assigned to an individual whose independence is clear and whose responsibility runs directly to the agency head and ultimately to the congress.  This legislation accomplishes that, removing *the inherent conflict of interest which exists when audit and investigative operations are under the authority of an individual whose programs are being audited.*

include "footnotes" in the final report, along with "a discussion of what the report did not examine," both of which OIG indicated are uncommon. (*See* Pl.'s Mem. at 19). Because the final report included both attributes, NACA insists that HUD improperly interfered with the audit process. In the Court's view, this argument unconvincingly elevates form over substance. Relatedly, NACA points to comparisons between the draft and final versions of the audit report, which supposedly confirm that HUD-OIG deleted 20% of the words from the original draft, and added 45% of the words to the final draft—all after the OIG auditors consulted with HUD officials. (*See* Pl.'s Exs. H, I). This argument also misses the mark, particularly since many of the changes referenced by NACA were purely stylistic and did not impact the substantive content of the audit report. At the end of the day, it is quite significant that the overall findings of the OIG audit report essentially remained unchanged—NACA was found to be generally in compliance with HUD requirements, and HUD-OIG recommended no action as a result of its audit. (*See* Pl.'s Ex. H). Absent some tangible, negative consequences against NACA flowing from the audit, it is difficult to discern how HUD's involvement with the audit process could amount to improper interference, much less the type of nefarious interference that would preclude the application of FOIA Exemption 5.

*     *     *

In sum, the Court has carefully reviewed the record in this case, including the documents submitted by HUD for *in camera* review, and, contrary to NACA's supposition, the Court finds no indication of the sort of extreme governmental wrongdoing that would estop HUD from relying on the deliberative process privilege to withhold records under FOIA. Consequently, the

---

S. REP. 95-1071 (emphasis added). When an Inspector General is auditing an external, non-governmental entity, as here, the conflict of interest concerns are less prevalent, which means that the OIG need not be as rigid in resisting agency input and involvement in the audit process.

Court finds that HUD properly withheld those documents that it deemed protected by the deliberative process privilege under FOIA Exemption 5.

### 3.  The Attorney-Client Communications Privilege

As a final withholding issue, NACA argues that HUD's reliance on the attorney-client privilege to withhold documents is unwarranted.  This subject garnered minimal attention in the parties' briefing—indeed, NACA's argument on this point was relegated to a footnote in it moving papers.  (*See* Pl.'s Mem. at 12 n.1).  Rightly so, though, because nearly all of the documents withheld under Exemption 5 on attorney-client privilege grounds were also withheld pursuant to the deliberative process privilege.  And since the Court already concluded that those records were properly withheld under the deliberative process privilege, it need not separately determine whether they could also be withheld on an alternative basis.  *See, e.g.*, *Martin v. U.S. Dep't of Justice*, 488 F.3d 446, 456 (D.C. Cir. 2007); *Ctr. for Nat'l Sec. Studies v. U.S. Dep't of Justice*, 331 F.3d 918, 925 (D.C. Cir. 2004).  As best the Court can tell, only one document remains an outlier—Document #23 in HUD's *Vaughn* Index, an email message entitled "Litigation Hold – NACA v. HUD."  To be sure, litigation hold letters are generally privileged, and the NACA offers no particularized argument as to why the attorney-client communication privilege should not and does not apply here.  The Court thus concludes that HUD properly withheld this document based on the attorney-client privilege under FOIA Exemption 5.[12]

---

[12]     Under FOIA, "[i]f a document contains exempt information, the agency must still release 'any reasonably segregable portion' after deletion of the nondisclosable portions."  *Oglesby*, 79 F.3d at 1176 (quoting 5 U.S.C. § 552(b)).  Though not specifically raised by NACA, the Court has "an affirmative duty to consider the segregability issue *sua sponte*."  *Trans-Pacific Policing Agreement v. U.S. Customs Serv.*, 177 F.3d 1022, 1028 (D.C. Cir. 1999).  In making this determination, the Court properly relies upon "the description of the document[s] set forth in the *Vaughn* index and the agency's declaration that it released all segregable material."  *Loving v. U.S. Dep't of Def.*, 550 F.3d 32, 41 (D.C. Cir. 2008) (citing *Johnson v. Exec. Office for U.S. Attorneys*, 310 F.3d 771, 776 (D.C. Cir. 2002)).  In this case, particularly in the absence of any

## D. NACA's Request for Attorneys' Fees

Finally, NACA seeks an award of attorneys' fees and costs under 5 U.S.C. § 552(a)(4)(E). Under FOIA, the Court "may assess against the United States reasonable attorney fees and other litigation costs reasonably incurred in any case . . . in which the complainant has substantially prevailed." 5 U.S.C. § 552(a)(4)(E)(i). In determining whether a fee award is appropriate, our Circuit has divided the inquiry into two prongs: "fee 'eligibility' and fee 'entitlement.'" *Brayton v. Office of U.S. Trade Rep.*, 641 F.3d 521, 524 (D.C. Cir. 2011). "The eligibility prong asks whether a plaintiff has 'substantially prevailed' and thus 'may' receive fees." *Id.* (quoting *Judicial Watch, Inc. v. U.S. Dep't of Commerce*, 470 F.3d 363, 368-69 (D.C. Cir. 2006)). "If so, the court proceeds to the entitlement prong and considers a variety of facts to determine whether the plaintiff *should* receive fees." *Id.* (emphasis in original).[13]

The Court, for several reasons, declines to rule on NACA's request for attorneys' fees at this juncture. First, NACA has not submitted any underlying documentation in support of its fee request, as required. *See Hensley v. Eckerhart*, 461 U.S. 424, 437 (1983) ("The fee applicant bears the burden of establishing entitlement to an award and documenting the appropriate hours expended and hourly rates."); *see also Covington v. District of Columbia*, 57 F.3d 1101, 1107 (D.C. Cir. 1995). Second, the Court's resolution of the parties' summary judgment motions may facilitate more meaningful discussions to informally resolve NACA's fee requests, absent further judicial involvement. As such, the Court directs the parties to meet and confer in an effort to

---

contrary contention on NACA's part, the Court finds that HUD's *Vaughn* indices and agency declarations are more than sufficient to satisfy its segregability burden. (*See* Snowden Decl. ¶ 29; Johnson Decl. ¶¶ 12, 14-20).

[13] More specifically, in determining whether a prevailing plaintiff is "entitled" to fees, the Court would be required to assess four factors: "(1) the public benefit derived from the case; (2) the commercial benefit to the plaintiff; (3) the nature of the plaintiff's interest in the records; and (4) the reasonableness of the agency's withholding." *Davy v. CIA*, 456 F.3d 162, 166-67 (D.C. Cir. 2006) (quoting *Tax Analysts*, 965 F.2d at 1093).

reach agreement on any outstanding fee issues.  *See* D.D.C. LOCAL CIVIL RULE 54.2(a).  Without making any findings at this point, the Court does note—with an eye toward advancing the parties' discussions—that NACA is likely to be awarded at least some amount of fees, given the Court's ruling on the adequacy of HUD's search efforts; on the other hand, since HUD successfully defended its withholdings under the deliberative process privilege (and otherwise), it is unlikely that a full fee award would be justified.  *See Judicial Watch*, 470 F.3d at 369 ("A plaintiff's overall success on the merits also must be considered in determining the reasonableness of a fee award.").  Finally, even assuming NACA's fee request is not informally resolved, the parties will be able to prepare more targeted briefing with the benefit of the Court's rulings on summary judgment.

## CONCLUSION

For the foregoing reasons, the Court concludes that both NACA's Amended Motion for Summary Judgment and HUD's Cross-Motion for Summary Judgment are **GRANTED IN PART** and **DENIED IN PART**.  NACA's motion is **GRANTED** as to the adequacy of HUD's search, but **DENIED** as to the propriety of HUD's withholdings.  Conversely, HUD's motion is **GRANTED** as to the propriety of its withholdings under FOIA's statutory exemptions, but its motion is **DENIED** as to the sufficiency of its search efforts.  Finally, the Court **DENIES WITHOUT PREJUDICE** NACA's request for attorneys' fees under 5 U.S.C. § 552(a)(1)(E).

An appropriate Order accompanies this Memorandum Opinion.


Date:  September 24, 2013

_____
ROBERT L. WILKINS
United States District Judge